Ryan **MERRIWEATHER**, Plaintiff,

v.

**MARION COUNTY SHERIFF**, Defendant.

No. 1:02 CV 01881 SEB VS.

United States District Court, S.D. Indiana, Indianapolis Division.

April 5, 2005.

See, also, 2004 WL 1234119.

Jaunae M. Hanger, Richard A. Waples, Indianapolis, IN, for Plaintiff.

Jeffrey S. McQuary, Indianapolis, IN, for Defendant.

### ENTRY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

This cause comes before the Court on the Defendant's Motion for Summary Judgment on Plaintiff's claim, pursuant to 42 U.S.C. § 1983, against the Marion County Sheriff (the "Sheriff"), in his official capacity, for violation of his Fourteenth Amendment due process rights as a result of his being victimized by two assaults while incarcerated in the juvenile section of the Marion County Jail ("Jail") and Plaintiff's additional state law claim of negligence related to the same two assaults. Defendant argues that he was not deliberately indifferent to the Plaintiff's risk of harm in the Jail and that the Indiana Tort Claims Act ("Tort Claims

Act"), IC 34–13–3–3, bars Plaintiff's negligence claim. The Court, being duly advised in the premises, now hereby DENIES the Motion for Summary Judgment.

### Factual Background

The facts concerning the incidents at issue in this litigation are generally not in dispute (*See* Sections A, B, C, D, and E, *infra*); however, the parties dispute the conditions and level of violence present in the juvenile section of the Jail and the policies and procedures the Sheriff had in place to deal with those threats (*See* Sections F and G, *infra*).

#### A. *Merriweather's incarceration*

Plaintiff Ryan Merriweather ("Merriweather"), aged seventeen at the time of the incidents, was arrested for armed robbery of a Chuck E. Cheese restaurant and incarcerated as a pretrial detainee in the Marion County Jail ("Jail"). Compl. ¶ 7; Merriweather Dep. ("Merriweather Dep."), p. 15. After spending a few days in the Marion County Lockup ("Lockup"), Merriweather arrived at the Jail sometime around the middle of December 2000[1] and was housed in the 2–O cell block, which at that time was limited to juveniles. Def.'s Ex. 2, p. 1 (Initial Investigation Statement Taken from Ryan Merriweather on December 22, 2000).

Defendant explains that juveniles are ordinarily housed at the Juvenile Detention Center adjacent the Juvenile Court located on the east side of Indianapolis. David Crisler, Sr. Dec. ("Crisler Dec."), ¶ 31. However, juveniles are housed in the Jail when they are accused of violent

---

1. It is unclear from the record when precisely Merriweather arrived at the Jail. The parties in their briefs erroneously refer to his arrival at the Jail and the first attack as both occurring on the same day. *Compare* Def.'s Brief in Supp. of Summ. J., p. 2 (stating Merriweather was assaulted on his first night in the Jail); *with* Def.'s Ex. 2, p. 1 (Initial Investigation Statement Taken from Ryan Merriweather on December 22, 2000) (stating that Merriweather had already been in the Jail for an undetermined number of days before the assault took place).

crimes, cause disciplinary problems, or for some other reason cannot be housed with other detainees at the Juvenile Detention Center. Crisler Dec., ¶ 31. Because Merriweather was charged with armed robbery, he was properly classified and housed in the Jail. Crisler Dec., ¶ 32.

## B. *The first assault on Merriweather*

On December 17, 2000, Merriweather was lying in his cell reading, when he overheard several other inmates making plans to rape him. Compl. ¶ 13.[2] Three inmates, Darvito Arnold ("Arnold"), Richard Childs ("Childs"), and Mitchell Ludy ("Ludy"),[3] entered his cell and grabbed him before Merriweather could call for help. Id. at ¶ 14. A fourth inmate, Donald Skipper ("Skipper"), stood as a lookout by the door to the cell block so he could alert Arnold, Childs, and Ludy if a correctional officer approached. Id. at ¶ 15.[4]

One of the attackers threw the book Merriweather had been reading in his face. The attackers then hit him with their fists and dragged him to the cell furthest from the cell block door, where they renewed their attacks by striking and kicking Merriweather and pushing his face into a mixture of water an urine in the cell's toilet bowl. Id. at ¶¶ 16—17; Merriweather Dep., p. 28.

The trio proceeded to pull Merriweather's pants down, dip shower shoes in the toilet bowl and use them to slap Merri-

weather's buttocks, sides, and abdomen. Id. at ¶¶ 18—19. One of the attackers inserted a pen into Merriweather's anus. Next, Ludy got a hot sauce bottle which had been stashed from lunch, inserted it into Merriweather's anus, pulled it out and shoved it under Merriweather's nose and forced him to smell it. Id. at ¶ 21. All the while the three attackers were taunting and laughing at Merriweather.

Childs and Ludy each pulled down his own pants and took turns inserting their penises inside Merriweather's butt checks; neither juvenile achieved full penetration.[5] Id. at ¶ 22. After they withdrew, the three perpetrators then shoved Merriweather's face into Childs' crotch and Childs ordered Merriweather to "lick my balls," but Merriweather refused to obey that command. Def.'s Ex. 2, p. 9.

Suddenly, upon hearing the sound of the heavy steel door to 2–O block rolling open, Skipper, the lookout, shouted a warning to the attackers that a correctional officer was approaching. From the time Childs, Ludy and Arnold entered Merriweather's cell until the correctional officer arrived, a total of approximately forty-five minutes had passed. Merriweather Dep., p. 33.

Having been warned, the attackers put Merriweather back into his cell. Compl. ¶ 23. As the correctional officer approached, Arnold, Childs, Ludy, and Skipper surrounded Merriweather's cell, acting as though they were socially conversing

---

**2.** In their briefs, the parties agree that this incident occurred on Merriweather's first night at the Jail; however, in his Initial Investigation Statement, Merriweather indicated that the attack took place after he had been at the Jail for several days. Def.'s Ex. 2, p. 1. In his deposition, Merriweather indicates he spent approximate three days at the Jail before the assault occurred. Merriweather Dep., p. 35

**3.** Mitchell Ludy is referred to both at "Ludy" and "Lundy" in the parties' briefs. We

choose to use "Ludy" as this is how the name appeared in the official Jail incident reports.

**4.** Arnold, Childs, and Ludy allegedly recruited Skipper to join them by telling him that they would rape him if he refused to serve as a lookout. Merriweather Dep., p. 57; p. 62.

**5.** The evidence indicates that neither boy penetrated Merriweather's rectum. Def.'s Ex. 2 at 8 (Initial Investigation Statement Taken from Ryan Merriweather on December 22, 2000).

with him, thus obstructing the correctional officer's view of Merriweather and preventing the correctional officer from seeing that Merriweather had been beaten and was partially unclothed. Id. at ¶ 24. As they surrounded Merriweather, the attackers brandished shanks to further intimidate Merriweather, instructing him to keep quiet. Id. at ¶ 25. Afraid for his life, Merriweather complied with his attackers' threat and did not call for help or report the fact of the assault he had suffered. Id. at ¶ 26.

The next morning, Monday, December 18, 2000, Merriweather was escorted out of the Jail for a regularly scheduled appearance in Juvenile Court. Id. at ¶ 28. Capitalizing on his safety in that place, he reported the assault and rape to a court bailiff, Bruce Wright ("Wright"), who was also Merriweather's uncle. Merriweather Dep., p. 40. Wright passed the information about Merriweather's assault on to Merriweather's parents, who in turn told Merriweather's lawyer, Norm Reed. Defendant contends that as soon as Jail officials learned of the attack on Merriweather, they removed the attackers from the cell block. Id. at ¶ 30. Correctional officers took Merriweather to Wishard Hospital where he was treated for his injuries, which included contusions and abrasions. Id. at ¶ 32. The attackers were prosecuted and convicted for rape and are now each serving sentences of eighteen to nineteen years. See Def.'s Ex. 6 (Criminal Information in State v. Arnold, et al.); Merriweather Dep., p. 47.

### C. Cell block 2-O

The attack occurred in cell block 2-O which is located in the old wing of the Jail. The cell block consists of a row of seven cells that are back-to-back with the row of cells that makes up the 2N block. A corridor extends in front of the cells and connects the two rows, making a "U." At each prong of the "U" is a steel door connecting to the main sallyport for that floor. Crissler Dec., ¶ 27. A correctional officer is stationed in the sallyport twenty-four hours per day. Although the officer would not necessarily be able to see through the window in the steel door, Defendant asserts he or she would be able to hear inmates shouting or banging on it, which is how inmates often communicate with the control room. Id. at ¶ 28.

Cell Block 2-O has a rated capacity of seven inmates. Id. at ¶ 29. On December 17, 2000 there were five inmates housed there, including Merriweather Id.; Merriweather Dep., p. 62. Thus, on the day of the attack, in terms of population, 2-O block was under capacity. Crisler Dec., ¶ 29.

### D. The second attack on Merriweather

Merriweather suffered a second, less serious, encounter with Arnold, Childs, and Ludy a few weeks after the first assault. Merriweather was playing basketball in the Jail's recreation area when he noticed his assailants were present as well, despite a "no contact" order applicable to them. Compl. ¶ 36. Merriweather asked for help from one of the correctional officers on duty and the officer told Merriweather to stay close to him. Merriweather Dep., p. 43. Despite these precautions, Mitchell Ludy took a swing at Merriweather with his fist, brushing Merriweather's cheek. Id at ¶¶ 38—39. The officer was able to diffuse the situation, but as Merriweather and the officer were leaving the recreation area, Richard Childs ambushed Merriweather, knocking him to the ground and repeatedly striking him with his fists. Compl. ¶ 42. Merriweather claims that he was on the ground with Childs on top of him hitting him for approximately a minute before correctional officers intervened. Merriweather Dep., p. 43. As a result of this assault, Merriweather suffered a

bloody nose but did not need medical treatment. Id., p. 74. Childs and Ludy were prosecuted for battery, in addition to the rape charges brought against them. *See* Def.'s Ex. 6 (Criminal Information in *State v. Arnold et al.*)

E. *Notice of the violent nature of Arnold, Childs, and Ludy*

It is not in dispute that Merriweather never alerted correctional officers or any personnel of the Sheriff prior to the sexual attack that he was in danger of being physically or sexually assaulted. Meriweather Dep., pp. 24–25, 68. Plaintiff contends, however, that the Sheriff had a long list of officially documented incidents involving Arnold, Childs, and Ludy establishing that they posed a significant risk to the safety of other inmates. The officials records included the following specific incidents: [6]

1. On or about July 6, 2000, in Block 3G, Childs bloodied another juvenile's face. The victim required off-premises hospital attention. Childs was left in the same cell block on lockdown for an unspecified period of time. Unusual Occurrence Report 61063.

2. On or about October 19, 2000, while in Block 2–0, Ludy was among a group of six juveniles who, in concert, assaulted a lone juvenile victim. The victim required off-premises hospital attention and then apparently was moved to another part of the jail. The report does not indicate whether Ludy or any of the other perpetrators were segregated from the general juvenile population in 2–0 after the event. Unusual Occurrence Report 63720.

3. On or about November 6, 2000, while in Block 2–0, Ludy, Arnold and

a third juvenile had a physical altercation with another juvenile detainee. All four juveniles were left in the block, pending reclassified, and the block was temporarily locked down. Unusual Occurrence Report 64134.

4. On or about December 1, 2000, in Block 4–0, Childs assaulted another juvenile. The victim was sent for off-site hospital care and returned to 4–0. Block 4–0 was locked down only until the victim was reclassified to another jail location. Unusual Occurrence Report 64833.

5. [On or about December 17, 2000, Ludy, Childs, and Arnold assaulted Ryan Merriweather in Block 2–0 (the first assault on Merriweather). Unusual Occurrence Report 65087.]

6. On or about December 18, 2000, Ludy and Childs, still apparently housed together, but now in Block 4G, simultaneously claimed to be suicidal and were placed in the glass suicide precautions tank together. JUSTIS System Jail Incident Report 65075.

7. On or about December 27, 2000, a juvenile detainee in Block 4–0 passed a note to a correctional officer stating Ludy is "causing problems in the block." A report was written by jail personnel, but no action taken. JUSTIS System Jail Incident Report 65204

8. [On or about January 2, 2001, Ludy attacked Merriweather during the recreation period and refused staff orders to stop fighting. Childs then also physically attacked Merriweather while the juveniles were being walked back to their cells, just as the group reached the stairwell area (the second assault on Merriweather). JUSTIS System Jail Incident Report 65363;

---

**6.** We include incidents preceding and subsequent to the assaults on Merriweather because the complete official record of Arnold,

Childs, and Ludy is central to Plaintiff's arguments.

Activity Record 65363; Merriweather Dep. 42–45.]

9. On or about January 2, 2001, correctional officers discovered that another juvenile had been beaten by two other juveniles housed there. The victim reported that the two juveniles who injured him were in the same gang ("Gangsters Disciples") as Mitchell Ludy and Richard Childs, who were also housed in 4–O. The victim indicated that, for his physical safety, he should not be housed with any of the four. JUSTIS System Jail Incident Report 65519.

10. On or about January 9, 2001, Ludy and Childs fought with one other while in the suicide precautions tank. Childs was removed from the tank. JUSTIS System Jail Incident Report 65605.

11. On or about January 17, 2001, Ludy was involved in a fight with another juvenile in the suicide precautions tank. The other juvenile was sent for off-site hospital attention; Ludy was returned to the suicide precautions tank. JUSTIS System Jail Incident Report 65868; Unusual Occurrence Report 65868.

12. On or about March 20, 2001, Ludy and an adult inmate arrive at Block 4L from the suicide precautions tank. The adult inmate indicated he had been in a fight with Ludy while both were in the suicide tank and was fearful of Ludy. The adult inmate was taken back to the suicide precautions tank and Ludy was apparently left in Block 4L. Unusual Occurrence Report 67561.

13. On or about April 22, 2001, Arnold attempted to take a phone away from another juvenile who was using it. When the juvenile resisted, Arnold punched him, choked him, and dragged him across the block. The victim attempted to tell of this attack to the correctional officer named in this incident report, but that officer took no action. Unusual Occurrence Report 68201.

14. On or about September 7, 2001, Arnold and another juvenile detainee attacked a third juvenile with their fists and a broom handle. The victim was sent for off-site hospital care, then reclassified to another housing unit. Unusual Occurrence Report 70860.

15. On or about September 22, 2001, Mitchell Ludy attacked an inmate, first from behind and then from the front, after the other juvenile turned around. The victim was taken for off-site hospital care. Unusual Occurrence Report 71092.

Plaintiff identifies at least two additional incidents of violence by Arnold, Childs, and Ludy which, for unexplained reasons, were not officially documented by Sheriff's personnel at the Jail. The first incident, involved an alleged attack by Ludy and Childs on Demius Clark ("Clark") in late November or Early December 2000. Clark suffered a concussion was sent offsite for medical treatment. Demius Clark Dec. ("Clark Dec."), ¶ 6. The second incident was an alleged assault by Arnold, Childs, and Ludy on Skipper shortly before the assault on Merriweather. Merriweather Dep. 26, 32; Def.'s Ex. 6 (Affidavit For Probable Cause p. 2).

F. *Conditions in the juvenile section of the Jail*

Conditions in the Jail and Marion County Lockup ("Lockup") have been the subject of repeated federal litigation over the past thirty years. *See, e.g., Carpenter v. Marion County Sheriff*, 1:03–CV–1023–RLY–WTL (Jan.13, 2005); Marion County Jail Inmates v. Anderson, 270 F.Supp.2d 1034 (S.D.Ind.2003) (Barker, J.); *Marion County Jail Inmates v. Cottey*, No. IP 72–

424–C B/S (April 11, 2002) (Barker, J.); *Jeffries v. Marion County Sheriff,* No. IP99–1942C–H/C (March 1, 2002); *Marion County Jail Inmates v. Cottey,* No. IP 72–424–C D/F (May 28, 1999); *Stovall v. McAtee,* 35 F.Supp.2d 1125 (S.D.Ind.1997); *see also* Pl.'s Submission # 1 (2003 Annual Jail Report), p. 3. However, these cases have focused on the unconstitutional conditions in the adult portions of the Jail and Lockup, not the juvenile detention facilities.

Merriweather has presented affidavits from several inmates indicating that the level of violence in the juvenile section of the Jail was as high, if not higher, than the level of violence in the adult sections of the Jail, with fights and assaults occurring on a daily basis. *See* Clark Dec., ¶ 4–5; Hawkins Dec., ¶¶ 7–8; Jordan Dec., ¶ 8; Lee Dec., ¶¶ 6, 13; Mathis Dec., ¶¶ 5–6; Paschall Dec., ¶¶ 5–10; Hillary Ricks Dec. ("Ricks Dec."), at ¶¶ 8–11.

The Sheriff claims that the actual level of documented and investigated violence in the Jail was substantially less than what Plaintiff asserts. *See* Stephen Summers Dec., ¶¶ 4, 5 (describing how, as one of two Jail investigators between 1993 and 1999 he would investigate an inmate-on-inmate battery complaint once every four to six weeks and that he had investigated only ten to fifteen sexual assault cases during those six years). Merriweather, however, cites evidence to establish that not all incidents of inmate violence were reported to prison officials, that not all violence reported to prison officials was officially recorded, and that not all incidents were prosecuted. *See, e.g.,* Lee Dec., ¶ 8; Clark Dec., ¶ 6.

G. *Policies adopted by the Sheriff to reduce violence in the juvenile portion of the Jail.*

The Sheriff represents that he has implemented several policies to provide for inmate safety and reduce the level of inmate-on-inmate violence. Foremost of these is the "classification" system, which incorporates a procedure whereby inmates are evaluated, among other things, as to their dangerousness or vulnerability and housed separately. Crisler Dec., ¶ 4. Under this policy, men are segregated from women, adults are segregated from juveniles, and inmates accused of violent crimes or demonstrating a propensity for violence in the Jail are segregated from those who are non-violent. Id. at ¶ 5. Inmates with disciplinary problems or who are considered especially dangerous are placed in solitary confinement. Id. at ¶ 6. However, Plaintiff contends that the Sheriff's personnel routinely fail to segregate the violent inmates and/or place them in solitary confinement after they committed assaults on other prisoners. *See* Clark Dec., ¶ 7; Charles Jordan Dec. ("Jordan Dec."), ¶¶ 11, 16–18; James Hawkins Dec. ("Hawkins Dec."), ¶ 12; William Lee Dec. ("Lee Dec."), ¶¶ 8—9.

Defendant claims that there existed several opportunities for inmates to contact correctional officers about problems. For example, Defendant contends that correctional officers made regular "clock rounds," during which they would enter the cell block, check the general security and cleanliness of the area, and investigate any problems. Crisler Dec., ¶ 8. This opportunity also allows inmates an opportunity to speak to the officers and alert them to problems. Id. at ¶ 10. The Sheriff contends, if an inmate informs a correctional officer that he is experiencing a conflict with another inmate, or feels threatened by another inmate, that correctional officers "reclassify" the threatened inmate, *i.e.* move him to another cell block. In addition to these regular clock rounds, officers are also present in the block every day to take inmates to court appearances, family and attorney visits, sick call, church

and recreation; the correctional officers also enter each block three times a day to deliver meals, and return to collect trays and used utensils. Id. at ¶ 12,13. Defendant notes that a forty-five minute interval such as that which occurred between the beginning of the first assault on Merriweather and the arrival of the correctional officer is consistent with the Jail's policy of requiring correctional officers to make visual inspections of the cells in the Juvenile block roughly every hour.[7]

Defendant contends that during December 2000, inmates in cell block 2–O had access to telephones inside their block and could use them to communicate with anyone to obtain help. Crisler Dec., ¶ 17. Defendant also asserts that inmates could communicate with Jail officials by writing notes on "call cards," which correctional officers collect daily; often times inmates leave "call cards" in between the trays to request protection, if they do not want other inmates to be aware of their request, for correctional officers to find as trays and utensils are counted after each feeding. Id. at ¶¶ 20, 23.

Plaintiff counters that correctional officers did not routinely follow the "clock rounds" policy and when the correctional officers did patrol through the cell blocks they did not inspect individual inmates, examine the conditions in the cell block, or investigate problems. Plaintiff further contends that the only way for the inmates to contact correctional officers outside the cell block was by banging on the cell block door, but even then correctional officers did not always timely respond to their calls, if they responded at all. Plaintiff asserts that the practice of banging on the cell doors created its own problems for inmates because it made obvious to the other inmates that someone was snitching (which could result in retaliation) and provided the other inmates an opportunity to drown out the pleas for help. Plaintiff also cites examples of alleged incidents of correctional officers not responding to reports of violence among inmates. Lastly, Plaintiff reports that the telephones in the cell blocks could only be used to make outside calls and thus could not be used to contact correctional officers for help. See Eric Mathis Dec. ("Mathis Dec."), ¶ 10; Joseph Paschall Dec. ("Paschall Dec."), ¶ 11—13; Hawkins Dec., ¶¶ 9—11; Jordan Dec., ¶¶ 11—16; Clark Dec., ¶¶ 9—11; Lee Dec., ¶ 8, 16—17.

Defendant asserts that correctional officers receive training prior to commencing their duty on inmate safety and the prevention of violence and thereafter they receive annual "in-service" instruction which includes inmate safety training. In fact, coincidentally, the topic covered in a recent in-service training session was prevention of rape. Crisler Dec., ¶ 24.

### Legal Analysis

#### I. Summary Judgment Standard

In a motion for summary judgment, the burden rests on the moving party, Defendant, in this case, to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the ab-

---

7. In his Sur-rebuttal brief, Defendant provides the correctional officer log book for the night of December 17, 2000, with the handwritten notes of the times when correctional officers performed patrols that evening. This evidence was never disclosed to Plaintiff during discovery, despite a request from Plaintiff for all documents that correctional officers "made notations on during their shifts." Defendant concedes that the log book should have been produced in discovery. Plaintiff did not request an opportunity to file a Sur-sur-surreply brief in order to respond to this belatedly produced information or to conduct additional discovery concerning the belatedly disclosed matter.

sence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Waldridge*, 24 F.3d at 920. A plaintiff's self-serving statements, unsupported by specific concrete facts reflected in the record, cannot preclude summary judg-

ment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir.1993).

## II. *Plaintiff's § 1983 claim.*

Merriweather claims that the Sheriff in his official capacity is liable under 42 U.S.C. § 1983 for a deprivation of rights secured by the United States Constitution,[8] namely, that his incarceration in the Jail subjected him to conditions of confinement which posed a risk of serious harm. Protection from the "deliberate indifference" of jail officials towards prisoners' safety is to be afforded both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments, respectively. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir.2003) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir.2003); *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002); *Brown*, 240 F.3d at 388; *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir.2000)). Merriweather was a pretrial detainee, having not yet been convicted of a crime. Thus, we analyze his § 1983 claim under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause; however, the due process rights of a person in Merriweather's situation "are at least as great as the Eight Amendment protections available to a convicted prisoner." *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir.1988) (citing *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)).

**8.** Section 1983 creates a federal cause of action for "the deprivation, under color of state law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of

the United States." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir.1997) (internal quotation omitted).

■ The Due Process Clause " 'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.' " *Anderson v. Gutschenritter,* 836 F.2d 346, 349 (7th Cir.1988) (quoting *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984)). Failure to provide such protection, however, violates constitutional standards only if " 'deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen.' " *Lewis v. Richards,* 107 F.3d 549, 553 (7th Cir.1997) (quoting *Haley v. Gross,* 86 F.3d 630, 640 (7th Cir. 1996)). The Seventh Circuit has repeatedly held that deliberate indifference is not a strict liability standard requiring jail officials to ensure the safety of their inmates. *Palmer,* 327 F.3d at 593.

■ To demonstrate deliberate indifference on the part of the Sheriff, Merriweather must be able to establish two elements: First, he must objectively show that "he was incarcerated under conditions posing a 'substantial risk of serious harm.' " *Palmer,* 327 F.3d at 593 (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Langston v. Peters,* 100 F.3d 1235, 1237 (7th Cir.1996)). To satisfy this element, Merriweather must demonstrate more than the mere prior occurrence of inmate-on-inmate violence as "[s]ome level of brutality and sexual aggression among [prisoners] is inevitable no matter what the guards do." *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991) *abrogated on other grounds by Farmer,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811.[9] Second, Merriweather must establish that the Sheriff "had knowledge of and disregarded the risk to his safety." *Palmer,* 327 F.3d at 593 (citing *Farmer,*

511 U.S. at 837, 114 S.Ct. 1970 (holding that "a prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety.")). Without demonstrating such knowledge on the part of the Defendant, he "can hardly have been deliberately indifferent to [the plaintiff's] safety." *Lewis,* 107 F.3d at 553 (citing *Goka v. Bobbitt,* 862 F.2d 646, 647–48 (7th Cir. 1988)).

Since Merriweather is suing the Sheriff only in his official capacity, he is required to establish that the Sheriff's department had a custom or policy that contributed to the infliction of the assault and his resulting injury. *Id.* at 594 (citing *Frake,* 210 F.3d at 781; *Garrison v. Burke,* 165 F.3d 565, 571 (7th Cir.1999)); *see also Butera,* 285 F.3d at 605 (holding that "if the Sheriff had notice of a substantial risk of serious harm to [the plaintiff] ... through the general conditions at the Jail, and he devised no policies or devised inadequate policies to attempt to prevent the assault, he would be 'deliberately indifferent' and [plaintiff] would prevail."); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (explaining that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Moreover, Merriweather must demonstrate an affirmative link between the policy and the particular constitutional violation alleged, that is, the assaults by Arnold, Childs, and Ludy. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

9. In *McGill* the Seventh Circuit noted that "violence is inevitable unless all prisoners are locked in their cells 24 hours a day and sedated (a 'solution' posing constitutional problems of its own)." *Id.*

The Seventh Circuit has directed that an unconstitutional custom or policy can take one of three forms:

> (1) [A]n express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Butera*, 285 F.3d at 605 (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir.2000)). (citation omitted).

Below, we address in detail the separate elements Plaintiff must prove:

### A. *Sheriff's knowledge of substantial risk of significant harm to Merriweather*

Merriweather attempts to prove the Sheriff's knowledge of a substantial risk of serious harm to him through both direct and indirect means. We address each approach in turn.

#### 1. *Direct Knowledge*

■ The most straightforward way for Plaintiff to demonstrate such knowledge on the part of the Sheriff is to show that he had actual knowledge of the risks Merriweather personally faced. Merriweather concedes that he had not given the Sheriff or any of the Sheriff's personnel any warning that he feared an attack from Arnold, Childs or Lundy.[10] Plaintiff instead relies on evidence that Sheriff's personnel already possessed significant information demonstrating that Arnold, Childs, and

Lundy posed a substantial risk of harm to other inmates. In particular, Merriweather submits Jail records from the six months preceding the first assault that indicate that Arnold, Childs, and Ludy had been involved in no fewer than four documented assaults on other inmates, three of which resulted in the victims receiving off-site medical care.[11] Merriweather produced evidence of two additional attacks committed by Arnold, Childs, and Ludy on other inmates, neither of which was officially recorded by Sheriff's personnel (even though one of the victims required off-site medical care). Both of these incidents occurred less than one month prior to the first assault on Merriweather. This evidence establishes that prior to December 17, 2000, Sheriff's personnel knew that Arnold, Childs, and Ludy had initiated repeated assaults on other inmates, that they had committed those assaults with increasing frequency and with such violence that several victims required off-site medical care. We conclude on this basis that Merriweather has produced sufficient evidence upon which a jury could find that the Sheriff had knowledge of the risks that Arnold, Childs, and Ludy posed to the safety of other inmates, including the Plaintiff, who were incarcerated with them in the juvenile portion of the Jail.

#### 2. *Indirect Knowledge.*

■ In proving knowledge of this substantial risk of harm, Merriweather can also present evidence from which a factfinder could infer knowledge "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. Evidence that "a substantial risk of inmate attacks

---

10. The materiality of Merriweather's failure to warn correctional officers about Arnold, Childs, and Ludy depends on how long Merriweather was incarcerated prior to the first assault, a fact that remains unresolved in the record.

11. All three assailants were not involved in each of the four assaults. Childs was involved in two of the assaults, Ludy was involved in two assaults, and Arnold was involved in one of the assaults.

was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it" would suffice. *Id.* (internal quotation omitted). Moreover, a defendant official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault," nor does it matter "whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843, 114 S.Ct. 1970.

Merriweather argues that the unconstitutional condition of the Jail was well documented and widely publicized, from which the Sheriff must have known about the risks that he faced. In support of this contention, Merriweather points to a long series of judicial decisions and newspaper articles describing the deplorable conditions in the Lockup and Jail. Indeed, this court is no stranger to the litigation relating to these facilities, having supervised jail conditions case for the past several years. Unfortunately, for Plaintiff, with the exception of one Indianapolis Star article,[12] all the third-party references relied on by Plaintiff relate to the other section of the Jail than the juvenile portion and, thus, are not directly relevant to this case.[13]

More apropos are the several affidavits proffered by Merriweather that substantiate that fights and assaults occurred on a daily basis in the juvenile portion of the Jail.[14] These affidavits, jointly and severally, indicate that the level of violence in the juvenile section of the Jail was as high, if not higher, than the level of violence in the rest of the Jail. Moreover, the level of violence described in these affidavits exceeds the level of inevitable, unavoidable inmate-on-inmate brutality and sexual aggression,[15] documenting instead a situation where "assaults occurred so frequently that they were pervasive." *Walsh v. Brewer,* 733 F.2d 473, 476 (7th Cir.1984) (describing such a level of violence as an unconstitutionally high risk of harm) (citing *Murphy v. United States,* 653 F.2d 637 (D.C.Cir.1981)).

Defendant counters that the actual level of documented and investigated violence in the prison was substantially less than what Plaintiff claims. *See* Stephen Summers Dec., ¶¶ 4, 5 (describing how, as one of two investigators between 1993 and 1999, he would investigate an inmate-on-inmate battery only once every four to six weeks and only investigated ten to fifteen sexual assault cases during those six years). Defendant's evidence is lacking in several respects. First, it only relates to incidents in which the victim sought to pursue criminal charges, not all incidents that had been reported. Id. at ¶ 6. Second, Merriweather has produced contrary evidence indicating that not all incidents of inmate violence were reported to prison officials, that not all violence reported to prison officials is officially recorded, and that not all recorded incidents are prosecuted. *See, e.g.,* Lee

---

12. *See* Pl.'s Submission # 5, "Jailed teens often face hard-to-stop attacks," *Indianapolis Star,* January 15, 2002, pp. A 1,6.

13. *See, e.g.,* Pl.'s Submissions # 1—2, 4, 12—17

14. *See* Clark Dec., ¶ 4–5; Hawkins Dec., ¶¶ 7–8; Jordan Dec., ¶ 8; Lee Dec., ¶¶ 6, 13; Mathis Dec., ¶¶ 5–6; Paschall Dec., ¶¶ 5–10; Ricks Dec., ¶¶ 8–11.

15. *See* McGill, 944 F.2d at 348.

Dec., ¶ 8. At best, Defendant's evidence creates questions of fact for the jury to resolve regarding the level of violence in the juvenile section of the Jail.

We conclude, therefore, that the record contains sufficient evidence upon with a reasonable factfinder could infer the substantial risk of harm in the juvenile portion of the Jail was significant and obvious.[16] Merriweather has presented sufficient evidence through this indirect method of proof to demonstrate the Sheriff's knowledge of the substantial risk of serious harm faced by the Plaintiff in the juvenile portion of the Jail.

B.  *Evidence of a custom or policy by the Sheriff.*

█ To survive summary judgment, Merriweather must also present evidence to establish that the Sheriff, after being on notice of the violent conditions in the juvenile section of the Jail and the substantial risk of harm to Plaintiff, "devised no policies or inadequate policies to prevent the assault." *Butera,* 285 F.3d at 605. This burden cannot be satisfied merely by noting the " 'existence or possibility of other better policies which might have been used.' " *Palmer,* 327 F.3d at 593 (quoting *Butera,* 285 F.3d at 605).

The Sheriff maintains that he was not deliberately indifferent to the violence in the Jail, pointing to several policies that were in place in 2000—2001 which were specifically aimed at reducing inmate-on-inmate violence. These policies included: inmate classification;[17] correctional officers making regular "clock-rounds;"[18] correctional officers being present in cellblocks three times a day at feeding times; allowing inmates, including in Cellblock 2-O, to use telephones; making available an intercom system to contact correctional officers; distributing inmate message cards which permit inmates to discreetly inform correctional officers of problems or to request protection; isolating inmates at special risk of assault and placing them in protective custody; segregating in administrative segregation (i.e. solitary confinement) inmates with a history of extreme misconduct; and training correctional officers prior to the commencement of duty on inmate safety and violence prevention.[19]

Plaintiff responds that many of the above-listed Sheriff's policies were routinely ignored or, in any event, do not accurately describe the actual practices and conditions in the juvenile section of the Jail. For example, Plaintiff notes that the telephones in the cellblocks could only be used to call the outside; correctional officers did not routinely follow the "clock-rounds" policy; the intercom system was not uniformly in place or functioning within the cellblocks; correctional officers did not timely respond to inmate requests for assistance; and correctional officers did not regularly segregate or otherwise punish violent inmates. *See, e.g.,* Jordan Dec., ¶ 11 –14, 16; Clark Dec., ¶¶ 7, 9—11;

---

16. We recognize that the reliability of the Plaintiff's witnesses are certainly open to challenge, since all but one witness are current or former inmates (the final witness, a defense attorney, appears to rely heavily on hearsay in her affidavit); however, questions of witness credibility should be resolved by a jury, not on summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

17. The Sheriff segregated inmates based on age, sex, and nature of offense. Crisler Dec., ¶ 4–6.

18. The policy directed correctional officers to patrol through the cellblocks approximately once an hour. Crisler Dec., ¶ 8—11.

19. Crisler Dec., ¶ 13 –14, 17, 19—25.

Hawkins Dec., ¶ 9 –12; Paschall Dec., ¶¶ 11—13.

The Jail's own records reveal that prison policies were inadequate to deal with the rampant inmate-on-inmate violence and that official policy was routinely ignored. Especially relevant to this case is the Sheriff's treatment of Arnold, Childs, and Ludy. The official Unusual Occurrence Reports from July 2000 through September 2001 indicate that Arnold, Childs, and Ludy were involved in no fewer than twelve separate assaults on inmates requiring seven separate trips to off-site medical care for the victims.[20] There were two additional times that inmates warned correctional officers about potential violence by Childs and Ludy, and these numbers do not include the additional undocumented incidents of violence committed by Arnold, Childs, and Ludy of which Merriweather had produced evidence.

The Jail's Unusual Occurrence Reports indicate that Arnold, Childs, and Ludy were not regularly segregated after committing assaults on other inmates; in fact, more often than assailant(s), the victims were the ones relocated to another cell block. Plaintiff's evidence indicates that for longer than a year his assailants committed almost monthly attacks on other inmates. After many of these assaults, the perpetrators appear simply to have been placed back into the general juvenile prison population where they could commit further assaults, which is, of course, what allegedly occurred in Merriweather's case.[21] These reports demonstrate repeated failures by the Sheriff and his staff to devise adequate policies or carry out existing policies to prevent Arnold, Childs, and Ludy (not to mention any other violent prisoners) from assaulting other inmates in the juvenile section of the Jail. Accordingly, we conclude that Plaintiff's evidence of policies and practices in the juvenile section of the Jail establishes that they were systemically inadequate to prevent the assaults committed by Arnold, Childs, and Ludy. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's § 1983 claim is *DENIED*.

## III. *Plaintiff's state law negligence claim.*

The Sheriff asserts immunity from Merriweather's state law negligence claim under the discretionary function exception of the Indiana Tort Claims Act, IC 34–13–3–3(7) ("Tort Claims Act").[22] Merriweather responds that the actions by the Sheriff as alleged do not implicate the Tort Claims Act.

A party seeking immunity under the Tort Claims Act "has the burden of proving that its conduct falls within the exception set forth in the [Tort Claims Act]." *Lake County Juvenile Court v. Swanson,* 671 N.E.2d 429, 438–439 (Ind.Ct.App.1996)

---

**20.** These numbers include the two assaults on Merriweather and once when Ludy and Childs fought each other.

**21.** The Sheriff points out that he has few options for segregating violent inmates from each other because virtually all the inmates housed in the juvenile section of the Jail have been charged with a violent crime or have a history of violence at the Juvenile Detention Center. Def.'s Reply Brief at 8. This may be true, but whether this fact impacts a finding of deliberate indifference will be for a jury to decide.

**22.** IC 34–13–3–3 provides that:

A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following:

     \*     \*     \*     \*     \*     \*

(7) The performance of a discretionary function;

The parties erroneously cite to the previous enumeration of this subsection (IC 34–13–3–3(6)), which was amended by P.L.161–2003, SEC.5.

(citing *Mullin v. South Bend,* 639 N.E.2d 278, 281 (Ind.1994)). The determination of whether a governmental act is discretionary is a question of law for the court to decide. *Hanson v. Vigo County Bd. of Comm'rs,* 659 N.E.2d 1123, 1125 (Ind.Ct. App.1996). Indiana Courts narrowly construe immunity "because it provides an exception to the general rule of liability." *Swanson,* 671 N.E.2d at 439 (citing *Hanson,* 659 N.E.2d at 1125).

To determine whether a governmental act is discretionary, Indiana courts apply the "planning/operational test." *Indiana Dept. of Financial Institutions v. Worthington Bancshares, Inc.,* 728 N.E.2d 899, 903 (Ind.Ct.App.2000) (citing *Peavler v. Board of Comm'rs,* 528 N.E.2d 40 (Ind. 1988)). The distinction between these two functions is explained as follows: " 'Planning functions are discretionary and therefore shielded by immunity, while operational functions are not. Planning functions involve the formulations of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices. Operational functions are characterized by the execution or implementation of previously formulated policy.' " *Id.* (quoting *City of Valparaiso v. Defler,* 694 N.E.2d 1177, 1182 (Ind.Ct.App.1998), *reh'g denied, trans. denied.*).

The Sheriff has failed to satisfy his burden of proving that his conduct falls entirely within the discretionary function exception of the Tort Claims Act. The Sheriff correctly notes that some of the conduct of which Merriweather complains, such as the failure to install video cameras in the juvenile portion of the Jail or to allocate more money to hire correctional officers, properly falls under the Torts Claims Act's protection for "planning" activities. However, the Sheriff fails to respond to the full breadth of Plaintiff's negligence claim, including Merriweather's argument that "the Sheriff systemically [sic] negligently failed to even adhere to its own policies, procedures, and state law with respect to classification, segregation, and clock rounds [and][t]hese ... allegations ... clearly implicate operational rather than policy failures." Pl.'s Resp. Brief at 31. Plaintiff's strongest claim of operational deficiencies, supported largely by uncontroverted evidence, is that the Sheriff repeatedly failed to follow his own policies relating to segregating violent inmates and that this failure directly resulted in the assault injuries that Plaintiff suffered on December 17, 2000.[23]

We determine that Plaintiff has presented sufficient evidence of operational negligence by the Sheriff to withstand summary judgment and, thus, the Sheriff has not satisfied his burden of demonstrating that his conduct fell within the Torts Claim Act's discretionary function exception. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's state law negligence claim is *DENIED.*

## IV. *Conduct and policies not relevant to this case.*

Defendant devotes substantial attention to the considerable improvements implemented by the current Marion County Sheriff over the past two or three years regarding the Lockup and Jail.[24] Defendant maintains that these recent efforts

---

**23.** Plaintiff does not present any evidence that the Sheriff failed to properly classify either Merriweather or his three assailants, so we will not consider Plaintiff's allegations relating to negligent classification. As for negligent administration of the "clock rounds" policy, as we have previously mentioned, there is a material dispute concerning whether the Sheriff's personnel followed the "clock rounds" policy in the juvenile portion of the Jail.

**24.** *See, e.g.,* Def.'s Reply Brief at 3–7.

are relevant to this litigation, citing as support the Supreme Court's decision in *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The reasoning in *Helling,* however, is inapposite here because, in *Helling,* the inmate brought suit against prison officials alleging that his exposure to second-hand smoke violated his Eighth Amendment rights. As the claims in *Helling* involved the inmate's then-present health conditions, as well as his ongoing exposure to second-hand smoke, the current efforts undertaken by prison officials were an appropriate defense. In this case, however, Plaintiff claims that the two, discreet incidents of violence against him resulted in a violation of his constitutional rights, alleging nothing relating to any on-going violations. Thus, while the recent, altogether commendable efforts by the Sheriff to ameliorate the unconstitutional conditions in the Jail are important, they are not relevant here because they do not reflect the prison conditions and the Sheriff's policies that existed at the time of the two assaults on Merriweather. Accordingly, the holding in *Helling* does not assist the Sheriff's case and the recent efforts by the Sheriff to improve Jail conditions are not exculpatory as to Merriweather's claims against the Sheriff.

Both parties have also spent considerable time discussing problems and policies that are not at issue in this case, principally, the problem of jail overcrowding. Plaintiff's repeated references to the problem of jail overcrowding [25] are met with Defendant's explanation of the official steps they have taken to control overcrowding.[26] However, because both parties agree that on the night in question Cell Block 2-O was not overcrowded, the discussion of overcrowding is not relevant to our decision in this case.

*Conclusion*

For the reasons set forth in detail above, we find that Plaintiff has provided sufficient evidence to permit a reasonable finder of fact to conclude that the Sheriff was deliberately indifferent to Plaintiff's substantial risk of significant harm in the juvenile portion of the Jail. Accordingly, we *DENY* Defendant's Motion for Summary Judgment on Plaintiff's § 1983 claim based on the alleged violation of his Fourteenth Amendment due process rights. We also conclude that Defendant has failed to satisfy its burden of establishing that the conduct supporting Plaintiff's state law negligence claims falls entirely under the Tort Claim Act's discretionary function exception to liability. We therefore also *DENY* Defendant's Motion for Summary Judgment on Plaintiff's state law negligence claim. It is so ORDERED.

**25.** *See, e.g.,* Pl.'s Resp. Brief at 7, 15; Pl.'s Submissions # 2, 4, 13, 15—17

**26.** *See, e.g.,* Def.'s Brief in Supp. at 8, 15—16; Def.'s Reply Brief at 4, 7.